Good morning. Good morning, Your Honor. Mr. C, I understand that the counsel in this case has worked out a somewhat uncommon sequence in terms of who goes when and saving of time and the like. But I understand that there's been agreement worked out between all counsel. So to assist me in helping you keep track of time, the Deputy Clerk is going to put on the clock the time that's kind of allotted to counsel to the extent you're splitting time. And then we'll go in whatever order you worked out. Thank you, Your Honor. I appreciate it. And just for the Court's benefit, I think our plan is I'll address our appeal. The other side will then address their appeal and the cross appeal. So I'll then return and offer a rebuttal and a response to the cross appeal. And then we'll finish with the rebuttal and the cross appeal. How much time are you hoping to save? I'm hoping to reserve about five minutes for my second turn at the podium. And I think our plan is I'll address our appeal. Thank you, Your Honor, and may it please the Court. I'm Gerard Cedrone here for the plaintiffs. Your Honor, the plaintiffs brought this lawsuit to vindicate two of their most fundamental constitutional rights. Their right to gather in a public forum and lawfully protest their elected leaders and their right to be free from the unreasonable use of force by government agents. Now, the District Court held that the plaintiffs, or at least the members of the plaintiff class, were not entitled to present those claims to the jury. But that decision rested on several legal errors. I know there are a few issues and sub-issues, so I'll highlight just three. First, the District Court committed a legal error in holding that the plaintiffs, or the members of the plaintiff class, were not seized because their movement was not terminated by chemical dispersants. That's in conflict with purely established law. Second, the District Court committed a legal error in applying or in holding that the plaintiffs had to satisfy a retaliation framework for their First Amendment claims instead of the clear and present danger test that traditionally governs decisions by the government to shut down a public forum. And third and finally, the District Court committed a legal error in failing to recognize that these constitutional violations were not just the acts of individual officers, but were attributable to the city of Phoenix itself. Let me start with the Fourth Amendment violation. Everyone would agree, I think, that if the officers here had walked into what was designated as the free speech zone, taken protesters by the wrist, and escorted them out and on their way, that would constitute a seizure. And the law has clearly established that it's just as much a Fourth Amendment violation to achieve that result by means of chemical dispersal agents. The two most relevant cases, I think, are this Court's decision in Nelson v. City of Davis and this Court's decision in Headwaters Forest Defense Fund against County of Humboldt. And I can describe each of those decisions, but I can both clearly reject what was the central premise of the District Court's Fourth Amendment decision and the premise of the defendant's argument on appeal, which is that you can't have a seizure when individuals are dispersed, that a seizure requires to locate somebody in place. Those are both clearly rejected by the decisions I just mentioned. So in the Nelson decision, you had UC Davis police officers breaking up a party on campus by using pepper spray and pepper balls, much as the officers did here. And in the Headwaters Forest Defense Fund case, you had officers using pepper spray and chemical irritants applied to the eyes of environmental protesters to get them to release themselves from lockdown devices. In the Davis case, they shot the pepper balls into one of the student's eyes, and the case said he was incapacitated and was in the bushes for 10 to 15 minutes. There maybe you can say it was a seizure because he literally couldn't move for 10 to 15 minutes. I think someone has to take him away. But here it's a little bit different here. They were, in fact, trying to disperse people out. It's true that there's that factual difference. I don't think that factual difference drove the court's reasoning. So if you read Part 1 of the court's decision in Nelson, the use of force that was, or rather the action that was deemed to constitute a seizure was the launching of the pepper spray, the launching of the pepper ball. And the court said specifically, even in the absence of Nelson's submission, the government's intentional application of force was sufficient to constitute a seizure. So I take the point that there is that factual distinction. But taking the law of qualified immunity, I don't think a reasonable officer could read Part 1 of the Nelson decision and the court's reasoning that was driving the decision and conclude that the use of chemical dispersants here was not a seizure. Even if it's a seizure, that just changes the legal framework. So then it becomes whether each step of what they did was reasonable in the fourth amendment statute. Of course. So if the court concludes that there was a seizure, as we think the court should, the district court didn't decide whether the use of force was reasonable. So our first answer would be the court should remand for the district court to go through this voluminous record in the first instance and apply the proper fourth amendment standard. We do, however, believe there is ample evidence to allow a reasonable jury to conclude that the use of force was unreasonable. You have evidence about the quantity of force that was used. You have video evidence showing what was happening at each moment at the fence at the police line. And a jury could watch the videos, could listen to the testimony and weigh the evidence and conclude that the use of force was not reasonable. To take just one example of a disputed fact that a jury would resolve, much of the defendant's reasoning is that at the moment that some individuals in this much larger crowd started shaking a fence, the deployment of pepper balls was necessary to stop the perceived risk of breach. I think reasonable minds could disagree about the likelihood of a breach at that moment and draw the conclusion that the use of force was unreasonable. And then later in the protest, once that initial deployment of pepper balls had taken place and there was no appreciable risk of a breach of the fence, there too I think a reasonable jury could watch the video and draw a conclusion about whether launching canisters of tear gas to completely clear out the free speech zone, the zone that had been designated for speech, was justified based on what was going on at the time. Was the attempt to breach there too? And was that around the time that the president was leaving the convention center? I think it was roughly. Importantly, though, the record makes clear that the means of egress that the president was taking from the convention center was nowhere near this free speech zone. So I think it's clearest from volume 12 of the record, which contains a map, a page, and I'll get the page number in a second. But there's also testimony at page 603 of volume 3 of the excerpts of the record that the motorcade was on 5th Street. This free speech zone was at, the motorcade that the president was leaving by was going to be using 5th Street. The free speech zone was on Monroe between 2nd and 3rd, and there's a map at page 2911 of the sealed appendix. And then there's radio traffic at page 2950 of the sealed appendix, which is volume 12, showing exactly when the motorcade had cleared the area. So I think it's important to keep in mind, and this is something a jury would consider, that the convention center is a complex of buildings, and these two areas weren't close to one another in the book. Well, for many hours, and it was peaceful and lively, and then at this critical moment, there's clearly an attempt to breach defense. Defense is not that impressive. And they respond first with the fire to the ground of chemical agents, and then bottles and other things were thrown, and then they move further. Are we really supposed to be given the reasonableness standard? Are we supposed to be second-guessing this kind of crowd control at a critical moment to make sure things that have gone well don't spin out of control? I think we're not supposed to be, but I think a jury is entitled to weigh the evidence and decide what was reasonable, properly instructed on the law, properly instructed on what the reasonableness standard requires. But yes, and just to take issue with maybe one premise in the question, I think a reasonable jury could decide that there was not a clear attempt to breach defense. I know that's the defendant's position, and perhaps that's one reasonable read of the testimony and a reasonable take from the video. I think a rational jury would be entitled to conclude. Then you also have the issue that if you have a bail-on, I think a reasonable jury can decide. I don't know if I know the issues to tag a city with liability, and you're just dealing with the officers. Then you have the qualified immunity law, which says it has to be clearly established that unless you have a case that specifically governs or squarely governs these specific facts under CASELA, you either have that or you have a situation where every reasonable officer can't do what they're about to do. Is that this kind of a case? I think it is, Your Honor, because, again, the qualified immunity framework is a two-step inquiry. At the first step, you draw all reasonable, you decide all disputed facts. We can do the steps on either order of importance. I understand. I guess all I mean to say is that even the second step of whether the constitutional right is clearly established, built into that is deciding all disputed facts in the plaintiff's favor and drawing all reasonable inferences in the plaintiff's favor, was there a clearly established constitutional violation? Our answer to that is yes. I think the flaw in the defendant's argument on qualified immunity is that they bake into the clearly established question disputed facts, like what was the risk of a breach of defense at that moment? What was the risk? I'm sorry for interrupting you, but I don't think time is running short, so I want to make sure that I get your position on this. The district court did not do an individualized analysis with regard to plaintiffs Yetlin, Travis, and William. And as your conversation with my colleague demonstrates, this is a pretty fact-intensive analysis. Should we be doing that analysis in the first instance, even if we choose to skip step one and go to a qualified immunity analysis? Or is this a remand for the district court to engage? Number one is these individuals, whether there was a Fourth Amendment violation, their conducts differ. So shaking the fence versus standing there and not doing anything, that's a different analysis potentially when it comes to a Fourth Amendment violation. Both of that step and the second step of determining whether there's clearly established law, I think the analysis has to go individual by individual. What's your response to that? So I agree in part, disagree in part. So I agree that if the court determines at the first instance that there's a seizure, yes, the appropriate conclusion is to remand for a decision as to whether there was unreasonable or whether a jury could conclude that there was unreasonable application, of course. The part I disagree in part or just want to make that clear. I'm going to have you address the class and what they encode are separately. My question goes towards Yetlin, Travis, and Guillen. Would the district court jury not engage in that analysis for these individuals? I disagree with that, Your Honor. The district court allowed those claims to proceed past summary judgment because it looked at the facts of those three individuals and determined that because they'd been struck by munitions as opposed to just cleared out by gas, they had shown a violation of their clearly established rights and could get to a jury on their claim. So those three plaintiff's claims arise in the cross appeal where the defendant officers are saying they should not get to a jury. Now, we obviously disagree with the court's distinction between plaintiffs who were struck by pepper balls versus plaintiffs who were cleared out by gas. We think constitutionally the decisions that we've been talking about show that that achieves a seizure just as much as the other. If we assume it's not the Fourth Amendment but it's the Fourteenth Amendment and the purpose to harm test applies, does that distinction still apply specifically with respect to class members who are not physically hit by the pepper ball? I think our answer would be the same as to the individual plaintiffs and the class plaintiffs, which is that there is enough evidence in the record to show a purpose to harm. You have the quantity of force in comparison to the government's stated interest. The rational jury would be entitled to weigh that and decide that the excess of force leads to an inference of a purpose to harm. You have the challenge point that was produced afterwards that I think shows... I don't see where the district court really engaged in the individual facts of each of these individuals' case, but if you say he did, I'll double-check the record. With regard to the class and Quentin Hoder, which should clearly establish laws at Nelson? That's right. So the district court, and I know that the opinion is hard to parse sometimes. There's lots of issues. As to Quentin Hoder, the district court held that their claims for injunctive relief failed essentially on the same basis as the class claims, and so if the court reverses on the class claims on the First and Fourth Amendment and sends it back, those organizations' claims would be part of that part of the case. As to why the district court held that Quentin Hoder is that the finding of no associational standing was only for claims that went beyond the class claims, so that they guys are called with the class together and he carved them off from anything beyond the class. Am I reading that right? That's my reading of it, too. I confess that it requires you sometimes to string together different parts of the opinion because there's a part that addresses it in the class section, there's a part that addresses it in the intro paragraph of the individual section, but that's my reading of the opinion, too. And as to Your Honor's question about when the district court did an individual analysis as to each of the three plaintiffs, a lot of that is a description in the facts section of the court's opinion where it describes exactly what happened to each of these three individuals. I read that part, but to me that's not the same as engaging an individual fact when it comes to the analysis, both at the Step 1 and also in the clearly established law at Step 2, Qualified Immunity. But let me ask you this. You said that you were relying on Nelson to establish the clearly established law for Qualified Immunity with regard to the class, but as I understand it, and I'm looking at the Nelson opinion, it says under the factual circumstances of this case, a reasonable officer would have been on notice that both the firing of a projectile that risks causing serious harm in the direction of non-threatening individuals who have committed at most minor misdemeanors and the release of pepper spray in the air, and blah, blah. So that essentially establishes a reasonable force. So we've been directed that you can't define the right at a high level of generality. Do you have in this case the firing of projectiles in the direction of non-threatening individuals and the deployment of pepper spray, and would you need that for clearly established law? I would, yes, but yes, we do have that. The officers launched pepper balls and tear gas and other munitions in the direction of the crowd, and remember the crowd had at most 20 people who were engaged in agitation or however the defendants define it, but the remainder of the crowd and the members of the class are defined by their peaceful conduct. That said, I disagree that the clearly established framework requires a level of specificity as to the specific use and combination and cocktail of chemical munitions. I agree that qualified immunity requires something to be clearly established, but I don't think it's quite that level of specificity. I know my time is running short, so I'll just say briefly on the municipal liability. The clearly established framework requires a level of specificity as to the specific use and combination of chemical munitions. I agree that qualified immunity requires something to be clearly established, but I don't think it's quite that level of specificity. I agree that qualified immunity requires something to be clearly established, but I don't think it's quite that level of specificity. Do you have a case that squarely governs these specific facts, or are you arguing on the general standard that every reasonable officer should have known you can't do this? We think that Nelson and Headwaters Forensic Defense are in the former category, that they do come close enough on their facts. If the court disagrees with that, as I was saying earlier, I don't think a reasonable officer could read the legal reasoning in Part 1 of the Nelson opinion and walk away thinking that the conduct was not acceptable. Thank you, Your Honor. Are in the former category, that they do come close enough on their facts. If the court disagrees with that, as I was saying earlier, I don't think a reasonable officer could read the legal reasoning in Part 1 of the Nelson opinion. Good morning, Your Honors. I'm Mary O'Grady, and I represent the City of Phoenix and the Chief of Police. And in our creative division of responsibilities here, I'm going to be addressing the issues raised in plaintiff's appeal. And we've allotted 13 minutes, and then my colleague, Mr. Rennick,  So I'd like to start by addressing the excessive force claim, and whether this is a Fourth Amendment claim or a Fourteenth Amendment claim. And we agree with the district court's analysis that the Fourth Amendment does not apply because there was no seizure here. Nobody's freedom of movement was terminated. So this doesn't fall under the Nelson case. If you have people in a space and officers come and they sort of shove them out and, you know, push them out, that's a seizure. But if you use chemical agents to move them out, that's not? If your aim, Your Honor, is to disperse the crowd. And for this, I somewhat rely on the Torres v. Madrid case, where they talk about the intent to restrain as part of something you look at, where if you're intending to restrain someone, as they were in Torres, where they shot this woman in an attempt to stop her, that would be a seizure. But here, if you're intending to disperse a crowd, that's kind of the opposite of an intent to restrain. You're getting people to leave. You're getting people to back up from the fence. So you don't satisfy that. You're restraining them from staying in the space that they want to be in. You're applying physical force to move them out of a physical space. How is that not a seizure and an assertion of control? There's no case that has said that that is a seizure. We have Madrid v. Torres that talks about this restraint concept, which is obvious from those facts. They shot at someone. They were trying to stop her. Here we are intending to disperse the crowd. Is Bull Connor with a water hose a seizure? He's trying to disperse the crowd. I think there you have a termination of ability to move, unlike you have here. He's trying to get them out of the space that he doesn't want them to be in. That, according to you, is not a seizure. If you're in, I think it's not a seizure. In these circumstances where you have people in downtown Phoenix, outside area, and they can go anywhere they want to go. They just need to leave this area, not go south of Monroe and leave this area around Monroe. Other than that, an ordinary person would understand that they are free to leave. They wanted them to leave. So this is not a seizure, which is often viewed in the context of arrests. That type of seizure, this is not a seizure under the Fourth Amendment where you're trying to get people to leave. Any more than it's a seizure when we have the show of authority of the wall there, that you couldn't go on the police barrier that prevented people from going to cross Monroe. That's not a seizure. That's just a show of authority. Don't cross this line. So same as here, when you're trying to disperse, you're not trying to restrain under Madrid. You're not terminating anybody's ability to move under Nelson. So this is not a seizure. And so the Fourth Amendment, in our view, does not apply, as the district court concluded, and it would be an analysis under the 14th Amendment. And there, because this is this rapidly changing situation where we have a presidential visit with increasingly violent activity from the crowd. Suppose we don't agree with you on the seizure point. I take it you think you would still win on the reasonableness analysis under the Fourth Amendment or under qualified immunity. Yes, Your Honor. We do think we still prevail if you apply the Fourth Amendment standard of reasonableness. And, again, it's not with 20-20 hindsight, but looking at it objectively from the perspective in the moment, you have the President of the United States across the street at this time leaving the building. You have a crowd gathering. They've been there all day, robust exercise of First Amendment rights, Trump supporters, Trump opponents all down there, and the police needing to manage the situation. And then you have from the crowd people trying to breach the fence along Monroe, which was a critical police barrier to keep that area clear. And so they fire the pepper ball to move people back. And then you have people throwing gas canisters from the crowd at the police, rocks at the police. The police needed to respond. They needed to respond decisively because if you don't, you can lose control of these situations very quickly. When plaintiffs Travson Gein were struck, I mean, hadn't most of the crowd already dispersed? And I think the President already left at that point. They were almost by themselves. So at that point it didn't seem like they posed a threat. And, you know, I don't think they were dressed like Antifa members. So, I mean, was it reasonable in that context? Maybe earlier on, yes, but at that point. And I may defer to my colleague, Mr. Minnick, to address that in the context of the officer's appeal, because the issues in the plaintiff's appeal focus on the gas. But there were issues unfolding as the evening proceeded that needed to address in terms of clearing the area to make sure that it was safe. So whether it's the, we think the 14th Amendment standard applies, but even if it's the Fourth Amendment, what happened here was reasonable as a matter of law. And then if you get past to the next layer of the clearly established issues for qualified immunity, there's also not clearly established law that would, you know, support the viability of these claims under this circumstance. Do you agree with counsel's assessment that the district court did an individualized analysis as to Yetlin, Travis, and Guyon? And if you disagree with that, should this be a remand for the district court to engage in the first instance? Or are you asking this panel to do it? Your Honor, I think that's also within the scope of the plaintiff's appeal rather than the appellant's appeal. If I'm getting the division of responsibilities appropriately, but I think the court did do, and I think your co-counsel's got a lot of work to do. So, yes, I will defer to him in answering that question, if that's okay, Your Honor. Sure. And so move in terms of the other claim, if there's the First Amendment claim, we think the court applied the correct standard there as well. Looking at the, you know, whether the deterring of speech was a substantial motivating factor in defendant's conduct, that's clearly not the case. They were responding to misconduct, increasingly violent actions from the crowd, and that's what was going on here. After a day, at the end of a long day of very fulsome First Amendment activity in downtown Phoenix by people of a variety of perspectives. And so the court properly analyzed that, and there's nothing in the record that supports that claim. But what about the little coin that was generated afterwards? Again, I think the critical point there was part of your acknowledgment there that was created afterwards by people. That coin was created by people unrelated to, there's nothing in the record that shows anyone related to this lawsuit created that. It was after the event occurred. Critically, Lieutenant Moore, the field force commander, you know, didn't have it, didn't have anything to do with that coin's existence. But it doesn't speak to the issues in this case because it doesn't say anything about what was going on that day and the objective reasonableness of the conduct that day. And certainly doesn't show any intent to, you know, deter people's speech. There's also a reference in the district court's opinion to some kind of a PDF or some kind of slide that was done that, in preparation for getting people ready for the event, that apparently had something that depicted one of the, you know, someone who was supposed to be a member of one of these identifiable groups. Do you know what that reference is about? I know that there's a picture in some of the training materials of someone who was with these identifiable groups, but that's from a prior protest. But again, that doesn't. There is that in the records. The district court didn't cite a page in the district court record where it was, and I couldn't find it. I wanted to see that, and I couldn't. And the briefs, so far as I could tell, didn't say where it was. And I don't have a note in my notes on that either that I've brought here, but I will check in and see. And I see that they're shuffling through their papers to see if they can find that. Okay. If someone could, even if by a letter to the court, tell us where, if, whether that's in the record and where, because I had difficulty finding it. District court clearly references it as if he, you know, has seen it, and so it presumably is there, but I couldn't find it. We will track that down for you, Your Honor, if it's not identified by the time we leave this morning. But again, that would say nothing about. But that's a prior thing that sort of shows a little bit of, you know, this is who we have to deal with, and this is how we're going to, you know, use force against. And that shows a little bit of intent, doesn't it? I don't think that's a, I think that reads a lot into this picture that's in those materials, and really doesn't say anything about the intent that evening. And this isn't a situation where anyone was arrested. This was, you know, various uses of force and other mechanisms to try and disperse the crowd. So I don't think it says anything about the intent that evening. The other claims are, you know, the supervisory liability of the chief. I think the briefing covers that. If there are questions, happy to address that. And the Manelle liability. And on both, and I'm happy to address questions on that as well. Again, there's no vicarious liability here. They need independent actions of misconduct that would, you know, satisfy a Manelle claim. And there's really nothing here that supports, nothing in the record that supports Manelle liability on the part of the city. And nothing in the record that would support any supervisory liability for the chief. And I think we've reviewed that in our briefing. Happy to answer questions if there aren't any. And otherwise, shockingly, I will end and let Mr. Mennick address the remaining issues unless there are further questions. I'll give you an extra minute to him. Thank you. Good morning, Your Honor. Stephen Renick for the individual defendants on their appeal of the denial of their motion for summary judgment on the grounds of qualified immunity. Our schedule has two minutes reserved for me for rebuttal on that appeal. We, of course, are all familiar with the two-prong approach to qualified immunity. Was there a constitutional violation? Was it clearly established? And I think the discussion by both counsel so far has really addressed the first prong, the constitutional violation issue. Though leading into that, I would address Judge Flynn's questions about whether or not the district court did an adequate individual analysis as to the three individual plaintiffs. And the answer that I would give is both yes and no. Yes, in the context of what the district judge believed was the clearly established law. The discussion of the facts regarding the actions of those three individuals is in the order. And the judge saw it as adequate to justify the decision that there were disputed facts to go forward to trial and deny qualified immunity. Our issue is with what the judge thought was the clearly established law at issue here. And that's what was raised in the appeal. And in both sides, there was a disagreement as to what the court's statement as to what that clearly established law was. Our argument was that the standard that the judge imposed was too general. It didn't meet the standards as Judge Collins has been talking about, about the clearly established and the sense of the facts. Can I ask you to focus on Guillen? Because at least from the video, I had a hard time seeing what exactly was the application of force, what she was doing and what the people around. It seemed much later in the evening than the other two individual plaintiffs. And so what does the record show about where she was when she was? And she also talks about being hit on on one side. And how was she hit and what were they responding to nearby her? And where is that in the in the video record? I apologize, Your Honor. The details, I'm unfortunately not feeling off the record to give to you. I came into the case late. So I would have to defer to the briefing for more of the specifics. I will say that I think the plaintiffs in their briefing were fairly straightforward as to what the circumstances were. And I think that they've presented that fairly clearly. I think the issue, the fundamentals. The other two. I mean, the argument, as I understand it, on qualified immunity is that, you know, they happen to be or place themselves right in the area where the action was happening. So, you know, one fellow goes right up to the fence, like within seconds of the first class. He goes right back up to the fence and shakes it again and gets hit. And then there's the other who, you know, there's the advancing line and she's, you know, videotaping them right feet away from the line and gets hit. But again, I can't see an equivalent sort of that she's in an area of where there's an obvious sort of either misconduct by nearby people or there's a clear danger and risk that, you know, she could be impacted. I had a hard time seeing that from the video evidence. Well, she was with a group. She was. And if I can step back before I answer that question directly. Your Honor has pointed out essentially the key difference between what we think the evaluation with clearly established law should be versus what the plaintiffs in the district court did. They both focused on the actions of the individual, basically in isolation of what else was going on around them. Your Honor has described, particularly as to Travis and Yelden, that you really need to look at what was the total context. What was going on with the group in terms of the actions by the officers? And I think that applies again as well. She was part of and this is, I believe, the language from the plaintiffs themselves, part of a crowd of protesters. And she was. She's in a kind of sparse area where there's not a lot of people. She seems further down. She expresses concern. She doesn't know where she is allowed to go and not to go. So she's clearly not herself doing anything wrong or even trying to do anything wrong. And it's not clear from the video what's going on that she would be hit. But when we talk about clearly established law, the argument that we alluded to in our paperwork and I think really answers your question is, there is no clearly established law that explains to an officer when they are supposed to stop addressing a situation on a group level. In other words, looking at how you respond to the actions of a number of individuals acting intentionally or not. I think that's where the individualized analysis really comes in when you look at qualified immunity. Right. So let's say that the crowd had largely dispersed. So this is hypothetical. So if I get the facts wrong with regard to this case, don't worry about it. But let's say the crowd had largely dispersed and there's one or two individuals that then intermediate use of force was deployed. There may be a problem with regard to clearly established law, but there's also a problem in terms of what was the conduct at the time. Was it passive? Was it shaking the fence or reaching over to try to breach a police line? It's not the same thing as passively standing there in a relatively empty area filming, right? So doesn't the court have to go through each one and analyze what's the factual circumstances here to determine? Was there a seizure? Was there use of force? What level of force? Was it reasonable? And then was there clearly established law that would be closely analogous enough such that a reasonable officer would be put on notice? I don't see that the district court really did that. So for Ms. Julian, the record for me isn't even clear on whether the announcement of unlawful assembly made at the time that this force was deployed. And in one sense, I don't disagree with anything you said, except that it starts from the presumption that the officers should have been looking at these individuals solely as individuals, solely in the context of their individual actions. The reality here is that all of this started not just as the three individuals, but the entire process, which is part of what you have to factor in here, was dealing with group activities. It wasn't an individual who was trying to breach the fence. It was a group of individuals. It was a group action. And so the question becomes, is there clearly established law that would guide an officer in knowing when they need to shift their evaluative process from looking at this as group activity to individual activity? And our position is that there is no such clearly established law. We cited to Bernini and Megs as cases where there is looking at group activity, and the plaintiffs have said that's not analogous. That's why we're even accepting that premise. Help me understand how you think that applies in the context of Guillen specifically, because that's what I'm having trouble with. I think because the court below analyzed clearly established law issue from an individual point of view, and to the extent that there was any individual analysis, and I think within that context there probably was, her conduct was looked at in isolation. The district judge in terms of all three of the individuals did not ask the question, is there clearly established law governing how the officers should have reacted to the group that each of these people was involved with at the time of this incident that would have guided how they acted? Essentially, Your Honor, you're asking the question, perhaps, should the officers have known not to act towards the group of which Ms. Guillen was part of in the manner in which they did? If that's what, you know, if the court agrees that that's the level, the standard for clearly established law that should be considered, then perhaps, well, obviously we want all of it to go back. If it's not going to be completely reversed, but at the very least, if the district judge was told to analyze the claims as to Ms. Guillen from that different perspective, not her individual actions, but how did her actions, how did the group of which she was part of that crowd, was there clearly established law governing what officers could do in that context? Then, yeah, maybe, but I think there was never that analysis by the district judge as to whether or not there was clearly established law governing what the officers could do towards this group. That's not what the cases that were cited by the plaintiffs talk about. It's not what the district judge did. And our position is that there is no clearly established law and nothing that would make every officer know that in the context of a significant protest that had come to violence, that their actions were inappropriate. All right, we've got your answer. Our questions actually took you over time, but I'll give a couple of minutes back to you and I'm going to just say rebuttal. Thank you, Your Honor. Three points that I'd like to make in the remaining time. First, as to Ms. O'Grady's argument that there can't be a seizure if there's an intent to disperse protesters. To reach that conclusion, the court would essentially have to overrule, at least in relevant part, its decision in Headwaters and Nelson. Both of those cases involved a use of force to disperse and the court identified a seizure. Second, on the First Amendment issue, of course, we don't think you need to get into the question of motive because the court should have applied the clear and present danger test. But if the court does reach the question of motive, we think the challenge point is quite persuasive and not just after-the-fact evidence. You have a member of the force saying at page 2115 of the record, this is my team's new patch since Tuesday. You have at page 1651 of the record evidence that a grenadier testified that he must have received it from someone within the PPD. You have a text message to Lieutenant Moore at 2089 of the record recommending an inscription. And you have this training video slide that the district court reference is in the record because you didn't say and I couldn't find it. No, we were trying to look for it on the fly and we'll coordinate with our colleagues on the other side to get a letter to the court identifying the citation for that. I'm sorry we don't have it now. And then finally, at page 2443 of the record, you have a summary that makes clear that four PPD officers possessed the coin and at least one sold and distributed it. It's true that the defendants testified they don't know who made it. I think a jury would be entitled to look at the rest of that evidence and conclude that that's not credible. And that this evidence in overtly political terms, taking an image of one of the protestors, not a member of the class, but one of the protestors and putting it on a coin and distributing it, that that's probative of their intent. Finally, as to the individual plaintiffs, I think Your Honor's questions about Miskean are spot on. And I would, in terms of video evidence, point in particular to Defendants Exhibit 65 at 8 minutes or 8 hours, or sorry, it's a time, 8 p.m., 8.50 p.m. and 37 seconds. It's not a zoomed in video, but that's the point at which pepper balls are launched at her or whichever the munitions were launched at her. At that point, had the unlawful assembly announcement been made? I don't believe so. I believe the evidence is that the unlawful, the overhead announcement was at 8.52 p.m. And this is from page 62 of the effort after action of the record. And then the police Tahoe was used at 9.02 p.m. That's also from page 62 of the record. And this was also away from the free speech zone. The president was long gone by this point record say about what the. Officer said about why it was fired in the direction of Miskean. I don't remember off the top of my head. I'm sorry, but I think the video shows and a jury would be entitled to look at the video and conclude that there's nothing from that video justifying that use of force. I would also, as we're talking about the individual defendants, focus on Miss Travis. I know Your Honor pointed out that she was in front of the police line, but I would point in particular to Defendants Exhibit 71 at 1 hour, 23 minutes and 43 seconds. And thereafter, when she's hit in the back as she's being dragged away by two other members of the crowd by officers who are. She goes down after the first. That's what the video shows. And she's not just in front of a police in front of an advancing police line. So it's clearly the police are trying to move people down. And she's right in front of them. And so then it's a question of whether or not her choosing to be there disables them from using any kind of force at all as they're trying to move because of the risk that you'll be inadvertently hit. I agree. And that's the question that I think a jury would have to answer, because, again, this space is far removed from the free speech area. The president is long gone. And the moment where she's hit in the back is after that. So she's she's hit. She's down on the ground. She's pepper sprayed. And then the two others come in and take her away. And as she's being she's moving away from the officers, she's shot in the back by officers who testify that they're that they're expert marksmen. I know I'm over time. I'd just like to provide one more citation as to your honors question about where the district court did an individual analysis. We think that's at page 26 to 27 of the record, which is page 20 to 21 of the district court's opinion, where it goes through the three individual plaintiffs. And I don't take my colleagues on the other side to have raised the argument on appeal that the analysis wasn't individual enough. To the contrary, I think some of the policy today suggested that I mean, this qualified immunity analysis on page 23 of the district court opinion, which says the court finds the plaintiff's Fourth Amendment right not to be subjected to unreasonable force during a seizure by way of deployment, pepper balls, muzzle blasts and pepper spray, where less severe intrusive means of applying force were available in sufficient circumstances, was a clearly established right at the time of the officers force. That seems to me a textbook case of what Casella said we're not supposed to do, which is we just elevate the level of generality and frame a really broad rule and then just throw all the facts in with no regard for any of the individual circumstances. The Supreme Court has told us time and time again not to do that. And that seems exactly what he did here. I disagree, Your Honor. And that's partly because the court is also citing Nelson and citing Headwaters. And we think that in light of those cases, the law is clearly established in this area in the district court record. There will always be factual differences, but we don't see. I mean, Nelson, it's intentionally applying it directly into their eyes and face. And here, you know, it's trying to manage the control of the crowd with collateral impacts on members of the crowd and specific individuals. I think, again, to get to that point, to get to that argument, the defendants have to resolve factual disputes against us and draw inferences against us. And if you do the opposite, if you apply the normal summary judgment standard, once you find all the disputed facts in the plaintiff's favor and draw all the relevant inferences in the plaintiff's favor, we do think the law is clearly established and we do think the district court properly framed it at the right level of generality. All right. Thank you very much. Thank you, Your Honor. Thank you, Your Honors. Really quickly, I think ultimately the answer to certainly the last call, if we came from the United States Supreme Court in Graham, when it talked about how we must look judged by the perspective of the officer on the scene, not 20-20 hindsight, and most particularly split-second judgments and circumstances that are tense, uncertain, and rapidly evolving. I don't think you could have a better description of the events of this night. Things were happening, dealing with groups, doing different things in different places in front of different officers under different circumstances. They responded to what in their immediate analysis seemed to be the necessary response to the group activity. The fact that individuals were impacted doesn't change the fact that the situation must be analyzed by the officer's reactions to the group activity, not isolating out an individual. I think Your Honor put it best, do the police become handicapped from being able to act? Because there's a possibility that one individual in the midst of this group might not objectively deserve whatever might happen. The answer is you can't deal with group activities by judging each individual member of that group. And I think that's why the finding has to be there's not clearly established law beyond just what Your Honor mentioned is the generality of what the district judge used as the analysis. Unless the court has questions, I would submit at this point. It doesn't appear that we do. Thank you very much, Your Honor, for your very helpful arguments today. The matter is submitted.
judges: NGUYEN, COLLINS, LEE